OPINION OF THE COURT
Alice Schlesinger, J.
This is a motion for summary judgment in an action involving claims of medical malpractice, conversion, and fraud. Defendant David Greuner seeks summary judgment, under CPLR 3212, arguing that plaintiff lacks standing, as her claims are assets of her chapter 7 bankruptcy trustee. Further, defendant argues that plaintiff’s medical malpractice and conversion claims are barred by the statute of limitations, and that her fraud claim must be dismissed as duplicative of the medical malpractice claim.
Background
When plaintiff Maria Angeles Liberatore met defendant, she was, by her own admission, already addicted to Demerol, the pain-killing opioid (Liberatore aff f 3). Liberatore, in discussing the history of her addictions, states that she suffered a serious car accident in 1983, which caused her chronic pain *363 that she was, for years, able to deal with through exercise and minimal medication (id. ¶¶ 2, 3). Then, in 2009, she began receiving injections of Demerol, to which she gradually became addicted (id.). Despite her addiction, she states that she was functioning as a real estate developer and as someone with an active social life (id. ¶ 4). In June 2010, plaintiff presented at an emergency room and was denied Demerol (id. ¶ 5).
Plaintiff then hired defendant through a company he co-owned called “Elite House Calls, MD” (id. ¶ 6; Greuner aff ¶ 5).[1] Next, plaintiff states that
“David Greuner then became my drug dealer, regularly supplying me with Demerol, either personally or by sending his girlfriend or others to administer the drugs. While initially I would receive a daily injection from Greuner, it soon increased, to a point when he or his accomplices would inject me multiple times a day, charging me thousands of dollars” (Liberatore aff ¶ 7).
Plaintiff submits credit card and banking records showing that she paid Greuner—personally or through Elite House Calls, or one of its corporate siblings,[2]—more than $244,000 in an 11-month period between September 2010 and August 2011. It seems that in August 2011, plaintiff ran out of money. With no money left to take, plaintiff states that defendant “and his girlfriend took expensive purses, an expensive watch and other items from me in return for his drugs” (id. ¶ 9). Plaintiff alleges that she can’t remember when she stopped seeing Greuner, but she submits pharmacy records indicating that he was still prescribing Demerol and other drugs for her as late as April 16, 2013.
Having run out of money, plaintiff filed for chapter 7 bankruptcy on August 15, 2011 in US Bankruptcy Court for the Eastern District of Pennsylvania. In the bankruptcy action, plaintiff did not list her potential claims against Greuner as an asset on her Schedule B. Plaintiff attributes this to a diminished mental capacity at the time (id. f 21). Although she managed to file a bankruptcy proceeding, plaintiff’s capacity was allegedly affected by her opioid addiction.
*364 Plaintiff filed her summons with notice in this action on December 8, 2015. On January 27, 2016, she filed her complaint. Her first and second causes of action sound in medical malpractice, while the third is for conversion, and the fourth is for fraud.
Analysis
I. Standing
Plaintiff has submitted a copy of a “Notice of Proposed Abandonment of Property of the Estate” from Gary Seitz, the chapter 7 trustee of the estate in plaintiffs bankruptcy. The notice was filed on April 21, 2016 in the Bankruptcy Court. Seitz stated broadly that “[p]ursuant to Section 554 of the Bankruptcy Code, the Trustee seeks to abandon the unadmin-istered assets of the Debtor because the value of any such assets is far outweighed by the costs necessary to recover [them]” (notice of proposed abandonment ¶ 3). Seitz made clear that he is specifically abandoning any unadministered assets to plaintiff, stating that he “seeks to abandon the assets in favor of the Debtor” (id. ¶ 4).
More specifically, the trustee proposed to abandon to plaintiff “any such malpractice claims against . . . David Greuner” (id. ¶ 6). In conclusion, Seitz stated that he had “investigated the claims and has determined that any recovery of the potential claims is far from certain” and that it was in the best interest of the estate to abandon the claims, as “[t]he significant cost of pursuing the uncertain claims ... is burdensome to the Estate” (id. ¶¶ 9-10). Upon notice, none of plaintiffs creditors objected to the proposed abandonment.
In arguing that plaintiff has no standing, defendant cites to In re Arana (456 BR 161 [ED NY 2011]), which held that “[w]hen an action is not disclosed by the debtor, it remains property of the bankruptcy estate even after the case is closed—indeed, unless it is administered or abandoned by the trustee, the action remains property of the estate forever” (id. at 170 [internal quotation marks and citation omitted]). Thus, plaintiff has standing only if the trustee has abandoned her claims.
Defendant argues that the trustee has not done so with regard to plaintiffs fraud and conversion claims, as the trustee referred specifically to malpractice claims against the defendant, but not to the fraud or conversion claims. Even those malpractice claims, defendant argues, were not referenced with enough specificity.
*365 Plaintiff, on the other hand, argues that the trustee’s abandonment should be reasonably interpreted, rather than searched for magic words; in support of this proposition, plaintiff cites to courts that, in different circumstances, took an approach similar to the one recommended (see e.g. FOM Puerto Rico S.E. v Dr. Barnes Eyecenter Inc., 255 Fed Appx 909 [5th Cir 2007] [involving the interpretation of a creditor’s release of a debtor’s guarantor in the context of a chapter 11 reorganization]). Defendant notes that plaintiff’s citations refer to chapter 11 reorganizations, in contrast to the present chapter 7 context.
In support of his contention that more specificity is required of the trustee’s abandonment, defendant cites to Donaldson, Lufkin & Jenrette Sec. Corp. v Mathiasen (207 AD2d 280 [1st Dept 1994]), where the First Department found that respondent, who had brought a $6 million arbitration claim against his former employer, had no standing to bring such a claim. In Mathiasen, the respondent, Kenneth Mathiasen, in a preceding chapter 7 bankruptcy proceeding, listed on a schedule of assets a claim against his former employer, the petitioner, but said the value was unknown and that his assets collectively were worth $2,000 (id. at 280-281). The First Department held that these disclosures were too vague and dissimilar from the subsequent $6 million claim to function as an abandonment by operation of law (id. at 282).
The present action is distinguishable from Mathiasen in several critical ways. First, we are not dealing with an abandonment by operation of law, but an express, uncontested abandonment by the trustee. Second, Mathiasen’s bankruptcy case was closed, while plaintiff’s bankruptcy remains open. Third, Mathiasen’s debts were discharged by the Bankruptcy Court, while plaintiff’s debts have not been discharged.[3] The import of these distinctions is that Mathiasen’s creditors did not stand to gain from the claims he brought to the arbitrator, while plaintiff’s creditors do stand to gain if she prevailed in this action. As plaintiff’s debts were not discharged in her bankruptcy proceeding, Mathiasen does not govern the result here.
Moreover, as plaintiff has not obtained any discharge against her creditors, she has not lost standing to bring this action (see *366 Koch v National Basketball Assn., 245 AD2d 230, 230-231 [1st Dept 1997] [“(t)he doctrine of judicial estoppel, which, in a bankruptcy context, bars a party from pursuing claims not listed in a bankruptcy proceeding that resulted in the party’s discharge, does not apply in the absence of a final determination in the bankruptcy proceeding endorsing the party’s inconsistent position concerning his or her assets” (citation omitted)]; see also B.N. Realty Assoc. v Lichtenstein, 21 AD3d 793, 798 [1st Dept 2005] [holding that, pursuant to 11 USC § 349 (b) (3), the respondent had not lost his counterclaims and defenses in a landlord-tenant dispute, despite failing to list them in a preceding bankruptcy, since he did not obtain “the functional equivalent of a discharge” from his creditors in the bankruptcy proceeding]).
However, in order to remedy any possible defect in the specificity of the express abandonment, plaintiff is directed to serve her complaint in this action and a copy of this decision on the bankruptcy trustee.
II. Statute of Limitations
Defendant seeks to dismiss plaintiff’s medical malpractice and conversion claims on statute of limitations grounds. Lib-eratore alleges that the effect of her drug addiction on her memory prevents her from knowing with certainty when her relationship with defendant ceased. However, she does submit pharmacy records indicating that she filled prescriptions written by Greuner as late as April 16, 2013. Greuner, on the other hand, measures the accrual date as June 30, 2011. He never states why he chooses this date, although he states in his February 29, 2016 affidavit that he “became acquainted” with plaintiff “sometime in 2010” and provided treatment to her for “approximately one year until our doctor-patient relationship ended” (Greuner aff ¶ 4). Greuner never specifies why the “doctor-patient” relationship ended, but his chosen accrual date is close to the time when plaintiff apparently ran out of money.
A. Medical Malpractice
The statute of limitations for medical malpractice, under CPLR 214-a, is two years and six months. Here, even if the court were to accept an accrual date of April 16, 2013, when it appears that plaintiff last filled prescriptions from defendant, the statutory period has lapsed. However, plaintiff claims that the statute should be tolled for insanity.
Plaintiff submits an affidavit from a psychiatrist, Dr. Jack Gomberg, who reviewed the pharmacy records and a letter *367 from Laura Cima, a longtime friend of plaintiff’s. Gomberg states that plaintiff’s drug use, as well as a traumatic brain injury she suffered in 2010, “would cause her to suffer the following functional deficits”: (a) inability to manage personal affairs; (b) inability to properly evaluate options/make decisions; (c) inability to understand the ramifications her actions; (d) inability to function in society (Gomberg aff f 3). Gomberg also found that the deficits would “not necessarily self-correct despite [plaintiff] going off the drugs for a period of time” and that it “would take years to recover [an] adequate mental state” (id.).
Another psychiatrist, Dr. Carlos Valle, concluded, based on his review of Liberatore’s pharmacy records between March 12, 2011 and September 20, 2011, that
“[a]ny person receiving these large amounts of opi-oids would suffer severe mental impairment and inability to function due to the cognitive adverse effects while under the influence (drowsiness, confusion, delirium), in between doses due to acute withdrawal (anxiety, irritability, compulsive behavior pursuing the next dose), and afterwards while coping with the iatrogenic addiction to opioids (a life long struggle)” (Valle aff ¶ 6).
Dr. Patrick Gallus, an emergency medicine physician and a former chief of staff at a hospital, who now runs a detox center, states that he met plaintiff at his center in February 2013 and that
“Ms. Liberatore arrived at our facility and was essentially incoherent, was having hallucinations, was incapable of rational communication, was suffering from infections from repeated injections, and I believe she was very close to death. . . .
“Ms. Liberatore’s mental capacity was that of a child, repetitive, rambling, incoherent and nonsensical. She could not care for herself, and was unable to have meaningful communication with anyone. . . .
“While Ms. Liberatore undertook our detoxification program in 2013, and her physical health improved somewhat, her mental condition did not improve. Ms. Liberatore remained child-like, unable to manage even the most basic of daily life issues. . . .
“In July 2015, Ms. Liberatore returned to the Gal-lus Center, and while her physical condition had *368 improved somewhat, her mental capacity had only marginally improved, and she continued to have the mental capacity of a child. She continued to suffer from memory lapses, an inability to stay focused on any topic, and she often repeated the same thing time and again. . . .
“It is . . . my expert professional opinion that Ms. Liberatore had no mental capacity to make any meaningful decisions, to understand the damage that had been done to her, or to commence a lawsuit against Dr. Greuner, even through the time she returned to our clinic in July 2015.” (Gallus aff ¶¶ 3-6, 8.)
Plaintiff also submits an affidavit from a retired judge in Pennsylvania, William Manfredi, a friend of plaintiff’s, who states that
“[biased on my interactions with [plaintiff] during 2010 through 2013 and my experience as a Judge, this individual was not capable of understanding what had happened to her during her dependency and what her legal rights were. I would not have allowed this individual to proceed on a civil matter in my court without clearance from a medical professional” (Manfredi aff ¶ 4).
Against all of this testimony is the fact that plaintiff was able to file for and navigate, however inexpertly, a bankruptcy proceeding during the period for which she seeks a toll. In fact, the bankruptcy judge found that Liberatore had the capacity to testify at a trial in the bankruptcy proceedings in 2013. The bankruptcy judge noted, in her memorandum opinion denying Liberatore a discharge of her debts, that “[w]hen she testified, she was coherent and articulate” (In re Liberatore, 503 BR at 27).
Courts have long narrowly interpreted the toll for insanity under CPLR 208 (see Eisenbach v Metropolitan Transp. Auth., 62 NY2d 973, 975 [1984] [noting that the legislature intended the toll to be narrow and that failing to give the statute such a construction could weaken the statute of limitations]). The Court of Appeals held, in Eisenbach, that CPLR 208’s toll for insanity “should not be read to include the temporary effects of medications administered in the treatment of physical injuries” (id.).
That formulation hints at two important distinctions between our case and Eisenbach. The first is that—based on the *369 substantial showing in support of plaintiff’s deficits—it would seem that the effects of the drugs plaintiff took were not temporary. That would militate for invoking the toll for insanity, as the temporary nature of the medication effects was critical to the resolution of Eisenbach. It is the second distinction, however, that is critical here: according to plaintiffs allegations—which we must take as true at this stage, where discovery has not really begun—Greuner was not really treating physical injuries, he was poisoning an addict for money.
That is to say, this is not really a medical malpractice case in essence. In medical malpractice, a well-meaning doctor is alleged to have harmed a patient through negligence. Negligence is alleged here in the most cursory way. The main thrust of the allegations, instead, is that Greuner did not behave as a doctor, but as a drug dealer, as one who intentionally harms the health of another in order to make money. As this is not really a medical malpractice action, it is not a good case to stretch the toll for insanity in CPLR 208 past its traditionally narrow construction, especially in circumstances where another court has found that plaintiff was competent to testify during the period for which she claims the toll. As the toll for insanity is inapplicable here, the branch of defendant’s motion seeking dismissal of plaintiff’s first and second causes of action for medical malpractice is granted.
B. Conversion
Under CPLR 214, the statute of limitations for conversion is three years. Thus, in order for the claim to survive, plaintiff’s claim must have accrued after December 8, 2012. Nothing in the record suggests that defendant converted any of plaintiff’s property after this date. Accordingly, the statute of limitations bars plaintiff’s third cause of action for conversion and the branch of defendant’s motion seeking dismissal of this claim is granted.
III. Fraud
Defendant briefly and without explanation states that plaintiff’s fraud claim should also be dismissed as untimely. Under CPLR 213, a claim for fraud has a statute of limitations period of six years. Defendant’s choice for the accrual date of the fraud claim is June 30, 2011. Thus, the fraud claim is clearly timely.
Defendant also argues that the fraud claim is duplicative of the medical malpractice claim. That is not true, here, where
*370 Liberatore’s allegations are more essentially fraud claims than medical malpractice claims. This distinguishes this case from Hsu v Liu & Shields LLP (127 AD3d 522 [1st Dept 2015]), and other cases like it, where overlapping fraud claims are tacked onto medical malpractice cases.
“The elements of a cause of action for fraud require a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages” (Eurycleia Partners, LP v Seward & Kissel, LLP, 12 NY3d 553, 559 [2009]). Here, plaintiff alleges that defendant made a representation that he was providing her with medical care, when in fact he knew that he was simply providing her with dangerous amounts of drugs for his own profit (complaint ¶ 40). More specifically, plaintiff alleges that Greuner repeatedly told her that Demerol, in the amount he prescribed and administered, was helping her and that taking such quantities of it was in her best medical interest (complaint ¶ 41). According to plaintiff, nothing could be further from the truth; the overuse of Demerol almost killed her (see Gallus aff), while Greuner enriched himself.
Greuner, allegedly, perpetuated the misrepresentation that he was providing medical care by stating that his girlfriend, Andrea Poulos, was a registered nurse qualified to administer Demerol, when she was not (complaint ¶¶ 46-48). Greuner’s misrepresentations, plaintiff alleges, were made to induce her to continue taking the large amounts of Demerol prescribed by Greuner and to pay the large fees demanded by Greuner; plaintiff further alleges that she did, in fact, rely on the misrepresentations and that her reliance caused her physical and financial harm (id. ¶¶ 49-52).
As plaintiff has stated a non-duplicative cause of action for fraud, the branch of defendant’s motion seeking dismissal of plaintiff’s fourth cause of action for fraud is denied. Given this disposition, defendant’s application for sanctions is, of course, also denied.
Conclusion
Accordingly, it is ordered that defendant’s motion for summary judgment is granted only to the extent that plaintiff’s first, second, and third causes of action are dismissed; and it is further ordered that plaintiff is to serve a copy of this decision and order, along with the complaint, on her bankruptcy trustee.

. Plaintiff also states that “Elite House Calls” was initially called “NY Hotel Urgent Med.”

. The financial records reference “Inn House Doctor,” “New York House Call,” and “Premier House Call,” in addition to “Elite House Calls” and “NY Hotel Urgent Med.”

. Defendant submits a copy of the Bankruptcy Court’s memorandum decision dated September 30, 2013, which found that plaintiff was not entitled to a discharge under chapter 7 of the Bankruptcy Code “because she unjustifiably failed to keep records or information from which her financial condition might be ascertained” (In re Liberatore, 503 BR 23, 37 [ED Pa 2013]).